In the
United States Court of Appeals
For the Seventh Circuit

No. 98-2127

MCI TELECOMMUNICATIONS CORPORATION, a Delaware
Corporation, and MCI METRO ACCESS TRANSMISSION
SERVICES, INCORPORATED, a Delaware Corporation,

Plaintiffs-Appellees,

and

UNITED STATES OF AMERICA and FEDERAL
COMMUNICATIONS COMMISSION,

Intervenors-Appellees,

v.

ILLINOIS BELL TELEPHONE COMPANY, doing business as
Ameritech Illinois, Incorporated,

Defendant-Appellee,

and

ILLINOIS COMMERCE COMMISSION, TERRY HARVILL,
RUTH K. KRETSCHMER, in their official capacities as
Commissioners of the Illinois Commerce Commission
and not as individuals, et al.,

Defendants-Appellants.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 2225--David H. Coar, Judge.

Argued November 6, 1998--Reargued December 2, 1999--
Decided July 24, 2000


No. 99-2805

WISCONSIN BELL, INCORPORATED, doing business as
AMERITECH WISCONSIN,

Plaintiff-Appellant,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, CHERYL L.
PARRINO, in her official capacity as a member of
the Commission, DANIEL J. EASTMAN, in his official
capacity as a member of the Commission, et al.,

Defendants-Appellees.

No. 99-2806

WISCONSIN BELL, INCORPORATED, doing business as
AMERITECH WISCONSIN,

Plaintiff-Appellant,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, CHERYL L.
PARRINO and JOSEPH P. METTNER, Commissioners of the
Public Service Commission of Wisconsin,

Defendants-Appellees.


No. 99-2811

WISCONSIN BELL, INCORPORATED, doing business as
Ameritech Wisconsin,

Plaintiff-Appellant,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, CHERYL L.
PARRINO, DANIEL J. EASTMAN, et al.,

Defendants-Appellees.


No. 99-2873

MCI METRO ACCESS TRANSMISSION SERVICES,
INCORPORATED, and MCI TELECOMMUNICATIONS
CORPORATION,

Plaintiffs-Appellants,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, CHERYL L.
PARRINO, DANIEL J. EASTMAN, in their official
capacities as members of the Commission, et al.,

Defendants-Appellees.

No. 99-2992

WISCONSIN BELL, INCORPORATED, doing business as
Ameritech Wisconsin,

Plaintiff,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, CHERYL L.
PARRINO, DANIEL J. EASTMAN, et al.,

Defendants-Appellees,

and

UNITED STATES OF AMERICA,

Intervenor-Appellant.


Appeals from the United States District Court
for the Western District of Wisconsin.
Nos. 97 C 566; 98 C 11; 98 C 153;
98 C 366--Barbara B. Crabb, Judge.


Argued December 2, 1999--Decided July 24, 2000


   Before RIPPLE, KANNE and DIANE P. WOOD, Circuit
Judges.

   RIPPLE, Circuit Judge.  These consolidated
appeals challenge determinations made by state
regulatory commissions exercising their authority
under the Telecommunications Act of 1996 ("the
1996 Telecommunications Act" or "the Act"), Pub.
L. No. 104-104, 110 Stat. 56 (1996) (codified in
scattered sections of Title 47 of the United
States Code). We must decide whether private
carriers may sue state commissions and their
commissioners in federal court for alleged
violations of sec.sec. 251 and 252 of the Act.
These sections set forth the process by which
Congress sought to bring competition to local
telephone exchange markets through
interconnection agreements between incumbent and
new carriers. See 47 U.S.C. sec.sec. 251 & 252
(Supp. II 1996).

   One of the consolidated cases, 98-2127, is
before us on rehearing. In this case, Illinois
Bell, Inc. (doing business as Ameritech Illinois)
("Ameritech Illinois") and MCI Telecommunications
and MCI Metro Access Transmission Services, Inc.
(collectively "MCI") claim that the Illinois
Commerce Commission ("the ICC") and various
individual Commissioners ("the ICC
Commissioners") violated the Act with respect to
the ICC's arbitration and approval of the
carriers' interconnection agreement. The ICC and
the ICC Commissioners filed motions to dismiss on
Eleventh Amendment immunity grounds. The district
court denied those motions, see MCI Telecomms.
Corp. v. Illinois Bell Tel. Co., No. 97 C 2225,
1998 WL 156678 (N.D. Ill. 1998), and the ICC and
the ICC Commissioners have appealed.

   We affirmed the district court's judgment in a

previous opinion. See MCI Telecomms. Corp. v. Illinois Commerce Comm'n, 168 F.3d 315, amended by 183 F.3d 558 (7th Cir. 1999). Thereafter, however, the Supreme Court issued a trio of opinions addressing the scope of Eleventh Amendment immunity. See Alden v. Maine, 527 U.S. 706 (1999); College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666 (1999); Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 527 U.S. 627 (1999). We therefore granted rehearing, restored 98-2127 to our calendar for oral argument, and requested that the parties file supplemental briefs addressing the impact of the Supreme Court's decisions on this case. See 183 F.3d 567, 567-68 (7th Cir. 1999).

The other cases, all from Wisconsin, are before us for the first time. Although aligned in various ways, the parties involved in the disputes include Wisconsin Bell, Inc. (doing business as Ameritech Wisconsin) ("Ameritech Wisconsin"), MCI,/1 the Public Service Commission of Wisconsin ("the PSCW") and various members of that commission ("the PSCW Commissioners"). In each case, the PSCW or the PSCW Commissioners or both were named as defendants, and they filed motions to dismiss the lawsuits against them on Eleventh Amendment grounds. The district court granted the motions, see Wisconsin Bell, Inc. v. Public Serv. Comm'n, 57 F. Supp.2d 710 (W.D. Wis. 1999), and the carriers now appeal the district court's judgment.

For the reasons that follow, we hold that the Eleventh Amendment does not bar these suits against the state commissions and their commissioners because, in the particular circumstances present in these cases, the states have waived their Eleventh Amendment immunity by participating in the regulatory scheme created by the Act. We also hold, as an independent basis for decision, that the carriers may proceed with their respective federal claims for equitable relief against the individual commissioners under the Ex parte Young doctrine.

I
BACKGROUND
A.  The Statutory Scheme

Congress enacted the 1996 Telecommunications Act "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996). The Act "fundamentally restructures local telephone

markets" by transforming the "long-standing regime of state-sanctioned monopolies" into a competitive market. AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999). Congress recognized that, even after the removal of regulatory restrictions on competition, significant economic barriers would remain to block entry into local telephone markets. Prospective market entrants would face the cost of duplicating an incumbent provider's local network infrastructure. To remove this economic barrier, the Act essentially requires incumbent local exchange carriers ("LECs") to share their networks with competitors. Section 251 of the Act requires incumbent LECs to allow new entrants to interconnect with existing local networks, to lease elements of existing local networks at reasonable rates, and to purchase the incumbents' services at wholesale rates and resell those services to retail customers. See 47 U.S.C. sec. 251 (Supp. II 1996).

Section 252 sets out the process by which incumbent LECs and prospective carriers establish interconnection agreements. First, incumbent LECs and prospective carriers must negotiate in good faith to reach voluntary interconnection agreements. At any time during the negotiations, a party may ask the appropriate state commission to participate as a mediator in the negotiations. See id. sec. 252(a)(2). If negotiations prove unsuccessful, subsection 252(b) provides for compulsory arbitration of any open issues. During the period from the 135th to the 160th day after an incumbent LEC receives a request for negotiation, any party to the negotiation may petition the state commission to arbitrate any open issues. See id. sec. 252(b)(1). Sections 251 and 252 establish certain standards that the state commission must follow in resolving open issues by arbitration and in imposing conditions on the parties. The state commission is also bound by Federal Communications Commission ("FCC") regulations issued pursuant to sec. 251.

Subsection 252(e) requires any interconnection agreement reached by negotiation or arbitration to be submitted to the state commission for approval and specifies the grounds on which a state commission can reject an agreement. Specifically, state commissions may reject negotiated interconnection agreements only if the commission finds (1) that the agreement discriminates against a carrier that is not a party to the agreement or (2) that implementation of the agreement (or a part thereof) would be inconsistent with "the public interest, convenience, and necessity." Id. sec. 252(e)(2)(A). A state commission may reject an arbitrated interconnection agreement only if the

agreement (or part thereof) (1) does not meet the requirements of sec. 251 and its implementing regulations or (2) fails to meet the pricing standards set forth in subsection 252(d). See id. sec. 252(e)(2)(B).

Subsection 252(e)(5) further provides that, if a state commission fails to carry out any of its responsibilities under sec. 252, then the FCC must assume responsibility for the proceeding and act for the state commission in carrying out its functions. An implementing regulation to sec. 252 provides that a state commission "fails to act" for purposes of subsection 252(e)(5)--thus prompting the FCC to step in and assume the state commission's responsibilities--if it fails to respond within a reasonable time to a request for mediation or a request for arbitration, or if it fails to complete an arbitration within the established time limits. See 47 C.F.R. sec. 51.801(b). A state commission will not be deemed to have failed to act, however, if it merely fails to approve or reject an agreement within the established time limits. See id. sec. 51.801(c). In such a case, the agreement will be deemed approved. See 47 U.S.C. sec. 252(e)(4) (Supp. II 1996).

Therefore, subsections 252(e)(1), (e)(4), and (e)(5), taken together and read in conjunction with the FCC regulations, create a scheme that provides regulatory oversight of interconnection agreements, either by a state commission or by the FCC in the state commission's place. Only one scenario, not present in our cases, appears to be a variation to this scheme:  when the parties reach a voluntarily negotiated agreement without any request for mediation or arbitration and the state commission fails to act to approve or reject the agreement. When these two circumstances occur, the resulting agreement will be deemed approved by the state commission, see id. sec. 252(e)(4); the FCC will not step in to assume the approval function.

The Act provides that federal district courts have exclusive jurisdiction to review FCC or state commission actions relating to interconnection agreements. In subsection 252(e)(4), Congress expressly eliminated state court jurisdiction to review actions of state commissions in approving or rejecting agreements under sec. 252. Moreover, subsection 252(e)(6), titled "Review of State commission actions," provides that, whenever a state commission fails to act, the exclusive remedies for that failure to act will be proceedings by the FCC and any judicial review of the FCC's actions. Subsection 252(e)(6) also provides that, "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such

determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 [and section 252]."

On a separate but related note, Congress also has opened up long distance service competition. The Act allows Bell operating companies/2 ("BOCs"), such as Ameritech Illinois or Ameritech Wisconsin in our cases, to provide long distance service to their customers--a service generally off limits to BOCs under the pre-1996 Telecommunications Act regime--once certain conditions have been met. Section 271 of the Act allows BOCs to provide "out-of-region" long distance service. See id. sec. 271(b)(2). For a BOC to provide "in-region" long distance service, however, the BOC must obtain FCC approval. See id. sec. 271(b)(1). To obtain FCC approval, the BOC must satisfy numerous requirements, one of which is to show that the BOC has opened up its local network to interconnection with new competitors. See id. sec. 271(c). A BOC may make this showing either by entering into interconnection agreements with "one or more unaffiliated competing providers of telephone exchange service," id. sec. 271(c)(1)(A), or, if no new entrants have requested interconnection with the BOC, by showing that the appropriate state commission has approved "a statement of the terms and conditions that the [BOC] generally offers to provide such access and interconnection," id. sec. 271(c)(1)(B). These two "methods" of obtaining FCC approval are commonly known as "Track A" and "Track B." See generally SBC Communications Inc. v. F.C.C., 138 F.3d 410, 413-21 (D.C. Cir. 1998) (discussing the tracks by which BOCs may obtain FCC approval under sec. 271 to provide in-region long distance services).

For a BOC seeking to obtain FCC approval using the Track B approach, subsection 271(c)(1)(B) requires the BOC to file with the appropriate state commission a statement of generally available terms and conditions (a "SGAT") and to obtain approval of the SGAT as provided by subsection 252(f). The SGAT sets forth the terms and conditions the company intends to offer new entrants seeking interconnection and access to the BOC's network. Once a BOC has filed a SGAT with a state commission, that commission has 60 days within which to complete a review of it, see 47 U.S.C. sec. 252(f)(3)(A) (Supp. II 1996), or to permit the statement to take effect, see id. sec. 252(f)(3)(B). According to subsection 252(f)(2), a state commission may not approve an SGAT unless the SGAT complies with subsection 252(d) and sec. 251 and the FCC regulations thereunder. The Act also allows state commissions

to establish and enforce state law requirements in their review of an SGAT, but the commissions may do so only if those standards do not conflict with the Act. See id. sec. 252(f)(2). Even after an SGAT has been allowed to take effect under subsection 252(f)(3)(B), however, the state commission may continue to review such an SGAT and may approve or disapprove it under subsection 252(f)(2) at any time. See id. sec. 252(f)(4). As with the interconnection process, if a state commission fails to act and the FCC has been made aware of that failure to act, the FCC must assume responsibility for the SGAT and act in place of the state commission within 90 days. See id. sec. 252(e)(5). Similarly, the judicial review provision in subsection 252(e)(6) also applies to state commission determinations regarding SGATs.

B.   The Illinois Litigation
1.   The Lawsuit

  Appeal 98-2127 began as a lawsuit over an interconnection agreement between Ameritech Illinois and MCI. After negotiations failed to produce an interconnection agreement between the two companies, MCI petitioned the ICC, in accordance with subsection 252(b)(1) of the Act to arbitrate the unresolved issues. The ICC held arbitration hearings and eventually approved a final interconnection agreement for the two companies. MCI then filed suit against Ameritech Illinois, the ICC, and various individual ICC Commissioners in their official capacities. MCI alleged that the ICC had violated certain sections of the Act when conducting the arbitration proceedings and approving the terms of the interconnection agreement. Ameritech Illinois filed a cross-claim against MCI, the ICC, and the ICC Commissioners in their official capacities, asserting that one aspect of the approved interconnection agreement was contrary to the Act. In their complaints, both MCI and Ameritech Illinois sought declaratory and other equitable relief./3

2.   The Motions to Dismiss

  The ICC and the ICC Commissioners moved to dismiss the claims against them on Eleventh Amendment sovereign immunity grounds. The ICC and the ICC Commissioners argued to the district court that the Act could not abrogate Illinois' immunity. They pointed out that Illinois had not explicitly authorized waiver of its immunity through any statute or constitutional provision. They further contended that their participation in the arbitration and review process under the Act did not constitute waiver of sovereign immunity because no provision of the Act required the state to submit to suit as a condition for

exercising the authority granted it.

Ameritech Illinois and MCI replied that Congress had conditioned state commissions' participation in the arbitration and approval process on their submission to federal court jurisdiction. Thus, they argued, the ICC and the ICC Commissioners waived any Eleventh Amendment immunity when they elected to implement the federal regulatory scheme set forth in the Act with full knowledge that their determinations would be reviewable exclusively in federal court.

In reply, the ICC and the ICC Commissioners reemphasized that the Act contains no specific language expressly conditioning state commission participation in the regulatory process on consent to suit in federal court. Rather, they contended, the Act provides only for federal court review of the agreements themselves.

3.  Decision of the District Court

The district court denied the motions to dismiss. The district court determined that the ICC defendants constructively had waived their Eleventh Amendment immunity and, in the alternative, that there was no Eleventh Amendment barrier to the suits against the ICC Commissioners because of the Ex parte Young doctrine. The district court's decision in this case preceded the Supreme Court's decisions in Alden, College Savings and Florida Prepaid, and, therefore, the district court could not have accounted for any impact those decisions might have on the Eleventh Amendment analysis.

(a)

The district court first determined that Seminole Tribe v. Florida, 517 U.S. 44 (1996), had not invalidated the doctrine of implied waiver. In the court's view, although Seminole Tribe restricted Congress' ability to abrogate directly the states' sovereign immunity, the Supreme Court's decision left untouched the "unremarkable and completely unrelated" doctrine of waiver. MCI Telecomms. Corp. v. Illinois Bell Tel. Co., No. 97 C 2225, 1998 WL 156678, at *6 (N.D. Ill. 1998) (quoting Seminole Tribe, 517 U.S. at 63) (internal quotation marks omitted). The district court then concluded that the ICC had participated voluntarily in the regulatory scheme established by the 1996 Telecommunications Act because the Act provided states with the option to arbitrate and to approve the interconnection agreements themselves or, instead, to let the FCC perform that function. Additionally, the district court noted, Congress had made it expressly clear in subsection

252(e)(6) that, if a state opted to participate in the regulatory scheme, its actions would be reviewable in federal court. Thus, the court concluded, the ICC had waived immunity from suit in federal court by participating voluntarily in the arbitration and approval process.

(b)

In the alternative, the district court also held that the doctrine of Ex parte Young provided a basis for the ICC Commissioners' lack of Eleventh Amendment immunity from this suit. The district court first noted that, contrary to the ICC Commissioners' arguments, the relief sought by Ameritech Illinois and MCI was prospective in nature. The companies sought no money damages but only declaratory and injunctive relief to redress ongoing violations of federal law.

The district court also rejected the ICC Commissioners' argument that an Ex parte Young action is available only when plaintiffs allege a constitutional (as opposed to statutory) violation. Relying on our decision in Marie O. v. Edgar, 131 F.3d 610 (7th Cir. 1997), the court held that an Ex parte Young action can be brought to vindicate violations of a federal statute.

The district court then concluded that the limitations placed on the Ex parte Young doctrine by Seminole Tribe and Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997), did not affect the application of the Ex parte Young doctrine to this case. Seminole Tribe limited, the district court acknowledged, the reach of Ex parte Young in cases in which Congress has created a detailed and comprehensive remedial scheme. But, the district court held, the provisions of the 1996 Telecommunications Act at issue in this case did not create any such detailed scheme that would limit the type of remedies available to a district court. The district court further held that the narrow exception to Ex parte Young created in Coeur d'Alene also did not apply to this case. The district court explained that "the issues of sovereign immunity presented by review of state actions taken pursuant to the Telecommunication Act are not nearly as compelling as those presented by the state of Idaho in the dispute over lands that it has historically considered a part of its territory." 1998 WL 156678, at *12.

Finally, the district court rejected the ICC Commissioners' argument that Congress did not intend to make states parties to the federal suits reviewing interconnection agreements, but instead meant only to provide review of the agreements themselves. In rejecting this

argument, the district court pointed out that the subsection providing for federal court review was titled "Review of State Commissions Actions." Id. at *14.

C.  The Wisconsin Litigation
1.  The Lawsuits
(a)

   Appeals 99-2805, 99-2873 and 99-2992 are the result of a dispute over an interconnection agreement entered into by Ameritech Wisconsin and MCI and approved by the PSCW. Ameritech Wisconsin and MCI had entered into interconnection negotiations as provided under subsection 252(a) of the Act, but because the parties failed to reach an agreement on some issues, MCI petitioned the PSCW under subsection 252(b)(1) to arbitrate the remaining issues. The PSCW held arbitration hearings and ultimately approved a final interconnection agreement between Ameritech Wisconsin and MCI.

   The final agreement satisfied neither party. Thus, Ameritech Wisconsin filed suit against MCI, the PSCW, and the PSCW Commissioners in their official capacities to challenge portions of the final agreement approved by the PSCW. In its complaint, Ameritech Wisconsin alleged that certain provisions of the final agreement were contrary to the 1996 Telecommunications Act. The complaint sought declaratory and injunctive relief to enjoin the enforcement of the challenged provisions. Thereafter, MCI filed its own suit against Ameritech Wisconsin, the PSCW, and the PSCW Commissioners in their official capacities to challenge other portions of the same agreement. Like Ameritech Wisconsin, MCI alleged in its complaint that various provisions of the final agreement violated the 1996 Telecommunications Act. MCI also sought declaratory and injunctive relief. The district court consolidated the two cases, and the United States later intervened. After the district court issued its decision in this case, each party filed its own notice of appeal.

(b)
   Appeal 99-2806 involves the PSCW's interpretation and enforcement of previously approved interconnection agreements between Ameritech Wisconsin and TCG of Milwaukee, Inc. ("TCG") and between Ameritech Wisconsin and Time Warner Communications of Milwaukee L.P. ("Time Warner"). Ameritech Wisconsin and TCG entered into their agreement, which was approved by the PSCW, following negotiations and arbitration; Ameritech Wisconsin and Time Warner arrived at their final agreement, which the PSCW also approved, after negotiations only.

Ameritech Wisconsin's interconnection agreements with TCG and Time Warner require "reciprocal compensation" only for "local traffic" calls (calls "beginning" and "terminating" within the "local calling area"). After the PSCW had approved these agreements, a dispute arose over whether Ameritech Wisconsin was required, under its respective interconnection agreements with TCG and Time Warner, to pay reciprocal compensation for calls placed by Ameritech Wisconsin customers to the Internet via Internet service providers who were, in turn, customers of TCG or Time Warner. Because Ameritech Wisconsin believed that the disputed Internet calls did not "terminate" within the local calling area, it deemed these calls not to be "local traffic" and therefore refused to pay reciprocal compensation for them.

TCG and Time Warner, however, understood their respective interconnection agreements to entitle them to reciprocal compensation for the disputed Internet calls. Thus, they filed separate complaints with the PSCW. The companies alleged that Ameritech Wisconsin was not complying with the reciprocal compensation provisions of their respective interconnection agreements, and they asked the PSCW to enforce those provisions. The PSCW adopted the interpretation proffered by TCG and Time Warner and later entered separate enforcement orders against Ameritech Wisconsin ordering it to pay the requested reciprocal compensation. Ameritech Wisconsin then filed suit in the district court and named as defendants TCG, Time Warner, the PSCW, and the PSCW Commissioners in their official capacities. In its complaint, Ameritech Wisconsin alleged that the PSCW's enforcement orders were contrary to the 1996 Telecommunications Act, FCC regulations, and Wisconsin law. The complaint sought declaratory and other equitable relief.

(c)

The final appeal, 99-2811, stems from the PSCW's rejection of an SGAT filed with the PSCW by Ameritech Wisconsin. In proceedings before the PSCW, a number of new entrants opposed portions of the SGAT filed by Ameritech Wisconsin. The PSCW adopted the views of those that opposed Ameritech Wisconsin's SGAT, and the PSCW eventually rejected the SGAT. Ameritech Wisconsin filed suit in the district court against the PSCW and the PSCW Commissioners in their official capacities to obtain judicial review of that decision. Ameritech Wisconsin's complaint alleged violations of the 1996 Telecommunications Act, and, to the extent that the PSCW had purported to rely on state law to make its decision, the complaint further alleged that the Act preempted

the state laws. Ameritech Wisconsin sought declaratory and other equitable relief./4

2.  The Motions to Dismiss

Like their Illinois counterparts, the PSCW and the PSCW Commissioners filed motions to dismiss each of these cases. They argued that the Eleventh Amendment provided them with immunity from suit in federal court.

Ameritech Wisconsin and MCI argued that Wisconsin had waived its immunity by choosing to regulate interconnection agreements in accordance with the 1996 Telecommunications Act. By exercising the power granted by the Act, according to Ameritech Wisconsin and MCI, the PSCW and the PSCW Commissioners had consented implicitly to being sued in federal court under subsection 252(e)(6). Alternatively, Ameritech Wisconsin and MCI argued that the PSCW Commissioners could be sued under the Ex parte Young doctrine.

3.  Decision of the District Court

The district court issued two decisions relevant to our discussion. In both opinions, the district court held that Eleventh Amendment immunity barred the suits against the PSCW and the PSCW Commissioners.

(a)

In its first opinion, reported at Wisconsin Bell, Inc. v. Public Serv. Comm'n, 27 F. Supp.2d 1149 (W.D. Wis. 1998), the district court granted the motions to dismiss. According to the court, the PSCW had not waived its immunity by performing its role under sec. 252 of the 1996 Telecommunications Act. Furthermore, the district court concluded that the suits against the PSCW Commissioners could not proceed under the Ex parte Young doctrine.

The district court first analyzed whether the PSCW and the PSCW Commissioners could have waived their immunity by acting on the interconnection agreements and SGAT at issue in the cases before it. In the court's estimation, Congress had made its intention sufficiently clear in the 1996 Telecommunications Act that state commissions would be subject to suit in federal court to defend their rulings. Nevertheless, the district court concluded, the Act did not obtain a valid, voluntary waiver of immunity from states. The court reached this conclusion after evaluating the Supreme Court's decisions in Parden v. Terminal Railway of the Alabama State Docks Department, 377 U.S. 184 (1964), and Employees of

the Department of Public Health & Welfare v.
Department of Public Health & Welfare, 411 U.S.
279 (1973), both of which concerned the so-called
"constructive waiver" doctrine.

   According to the district court, under these
cases the constructive waiver doctrine could not
apply to the 1996 Telecommunications Act for
several reasons. First, the court noted that,
despite the many changes in telecommunications
regulation wrought by the Act, the Act preserved
the states' role as the primary regulators of
local telephone service; the district court
understood the Supreme Court's holding in
Employees to preclude the application of the
constructive waiver doctrine "when the federal
government amends or enacts a law making a state
subject to suit merely by continuing in existing
activities to protect its citizens." 27 F.
Supp.2d at 1158 (citing Employees, 411 U.S. at
296 (Marshall, J., concurring)). The district
court next observed that when state commissions
are asked to review voluntarily negotiated
interconnection agreements, state commissions
must review that agreement "or accept the
consequence that the agreement will go into
effect without any form of government oversight."
Id. Finally, the district court explained its
view that "staying out of the interconnection
process cannot be said to be a realistic option
for a state commission" because the commission
cannot be expected to abandon its mandate to
protect the public interest. Id. For these
reasons, the district court explained, any waiver
obtained from Wisconsin under the Act could not
have been voluntary.

   The district court also determined that the Ex
parte Young doctrine was inapplicable to these
cases. The court reached this conclusion based on
its reading of the Supreme Court's decision in
Seminole Tribe. According to the district court,
in order for it to determine whether application
of the Ex parte Young doctrine was appropriate
here, Seminole Tribe required the court to engage
in a two-step inquiry. Thus, it analyzed (1)
whether Congress created a remedy for the rights
created in the 1996 Telecommunications Act and
(2) whether the remedy created by Congress
contemplated a suit against a state official. The
district court never reached the second aspect of
this inquiry because it concluded that, with the
Act, Congress had created an adequate remedy to
secure federal rights such that Seminole Tribe
precluded the application of the Ex parte Young
doctrine in these cases. The district court
explained that, although the remedy created in
subsection 252(e)(6) was "much less 'detailed'"
than the statutory remedy at issue in Seminole
Tribe, the court believed that it would be

improper simply to compare the two statutory schemes to see which one was more detailed. Id. at 1161. Rather, the court stated, "a 'simple' remedy may be all that is necessary to secure federal rights." Id. The district court concluded that Congress made a choice in the Act to limit the available remedy under sec. 252 "to having a commission's ruling tested in federal court." Id. This "limited review" scheme, said the court, allowed federal courts "to cure errors in federal law without subjecting state commissioners to the full remedial powers of a federal district court." Id. Under Seminole Tribe, the court concluded, the Ex parte Young doctrine could not be used here "because the remedy Congress chose secures federal rights adequately." Id. That Congress had chosen, as it turns out, an unconstitutional remedy did not change the result here, the district court explained, because under Seminole Tribe it was "prevented from 'rewriting the statutory scheme in order to approximate what [it thought] Congress might have wanted.'" Id. (quoting Seminole Tribe, 517 U.S. at 76).

(b)

   Although the district court had ruled that the suits against the PSCW and the PSCW Commissioners should be dismissed, the court stayed the enforcement of its ruling pending further briefing and argument by the parties on whether the PSCW and the PSCW Commissioners were necessary parties under Rule 19(b) of the Federal Rules of Civil Procedure. The district court also allowed the PSCW and the PSCW Commissioners to amend their answers to include a Tenth Amendment defense.

   Before the district court issued an opinion addressing the remaining Rule 19(b) issues, however, we issued our initial decision in 98-2127. See MCI Telecomms. Corp. v. Illinois Commerce Comm'n, 168 F.3d 315, amended by 183 F.3d 558 (7th Cir. 1999). The district court ordered further briefing and argument from the parties on the effect our opinion had on the cases before the district court. Then, the Supreme Court issued its rulings in Alden, College Savings and Florida Prepaid. After hearing argument from the parties, the district court issued a final opinion, reported at Wisconsin Bell, Inc. v. Public Serv. Comm'n, 57 F. Supp.2d 710 (W.D. Wis. 1999), dismissing the suits.

   In this second ruling, the district court explained that our initial decision in 98-2127 was no longer controlling in light of the Supreme Court's intervening decision in College Savings. According to the district court, it was obligated

to follow the most recent Supreme Court precedent, and College Savings, the court believed, compelled the dismissal of the suits against the PSCW and the PSCW Commissioners. The district court recognized that College Savings preserved "some apparent constructive waivers," such as when Congress provides a gift to a state in return for the state's waiver of immunity, but it concluded that the Supreme Court's decision precluded the finding of such a waiver in the context of the 1996 Telecommunications Act. Id. at 715. Instead, the court explained, "[t]here is no arguable basis to a claim that equates a gift with a state's participation in the act's cooperative federalism (supervising the regulation of local telephone carriers in the state)." Id. Within the context of the 1996 Telecommunications Act, the district court explained, a state's acceptance of the "gift" of being able to participate in the interconnection process could not be equated with the kind of "gifts" found acceptable by the Supreme Court in College Savings. "A state's continued regulation of local enterprise (local telephone carriers)," the district court reasoned, "is an 'otherwise permissible activity' that can yield no inference as to a state's motivation for doing it." Id.

The district court also reaffirmed its prior ruling on the applicability of the Ex parte Young doctrine. In addition to the points it had raised in its first decision, the court further noted two other problems with proceeding under the Ex parte Young doctrine in these cases. First, the court noted that "one must acknowledge the conceptual difference between a state official performing state functions in a way that violates federal law and a state official who is performing federally authorized functions but is alleged to have performed those functions improperly." Id. at 713. Second, the court noted "the oddity" of allowing an Ex parte Young suit to proceed against individual commissioners, some of whom may have dissented from the decision being challenged in court. Id. In the end, however, the district court explained that, even if these hurdles to applying the Ex parte Young doctrine could be overcome, Seminole Tribe precluded the application of the doctrine to these cases because the 1996 Telecommunications Act provided a limited remedy for violations of the Act./5

II
DISCUSSION

The Eleventh Amendment to the Constitution of the United States provides:

The Judicial power of the United States shall not

be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. U.S. Const. amend. XI. The Supreme Court has long held that this Amendment bars federal jurisdiction over suits brought against a state, not only by citizens of another state or a foreign state, but also by its own citizens. See, e.g., College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 669-70 (1999); Edelman v. Jordan, 415 U.S. 651, 662-63 (1974); Hans v. Louisiana, 134 U.S. 1, 13-15 (1890). The immunity conferred on a state by the Eleventh Amendment extends to state agencies as well. See, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993). Subject to the exception carved out in Ex parte Young, 209 U.S. 123 (1908), the Eleventh Amendment also bars federal jurisdiction over suits against state officials acting in their official capacities when the state is the real party in interest. See, e.g., Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101-02 (1984) ("Pennhurst II").

The immunity afforded to states by the Eleventh Amendment, however, is not absolute. See College Savings, 527 U.S. at 670. Congress may exercise its power under the Fourteenth Amendment and thereby authorize private suits against unconsenting states. See id.; Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976). A state also may waive its immunity from suit. See College Savings, 527 U.S. at 670; Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985); Marie O. v. Edgar, 131 F.3d 610, 615 (7th Cir. 1997). Additionally, the Ex parte Young doctrine allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law. See, e.g., Ex parte Young, 209 U.S. at 159-60; Dean Foods Co. v. Brancel, 187 F.3d 609, 613 (7th Cir. 1999); Marie O., 131 F.3d at 615.

We review de novo a district court's judgment on whether to dismiss a claim on Eleventh Amendment immunity grounds. See Goshtasby v. Board of Trustees of the Univ. of Ill., 141 F.3d 761, 764 (7th Cir. 1998), abrogated on other grounds by Kimel v. Florida Bd. of Regents, 120 S. Ct. 631 (2000).

A.  Threshold Matters

As a threshold matter, the ICC and the ICC Commissioners, relying on subsection 252(e)(6), submit that we need not concern ourselves with the application of the Eleventh Amendment because the 1996 Telecommunications Act does not even

provide for suits against states in federal court, but instead provides only for federal court review of the interconnection agreements themselves. We cannot accept this contention; the provisions of the Act, read as a whole, will not permit such a construction and, indeed, make clear that Congress' intent was to the contrary.

At the outset, we note that the subsection providing for judicial review is titled "Review of State commission actions," not "Review of interconnection agreements," thus signaling that Congress intended that the state commissions be parties to the federal court suits reviewing their actions, just as the FCC is a party to suits seeking review of its actions. Moreover, subsection 252(e)(4), when read in conjunction with subsection 252(e)(6), provides additional evidence that Congress contemplated suits against state defendants in federal court. Subsection 252(e)(4) provides that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." 47 U.S.C. sec. 252(e)(4) (Supp. II 1996). This language indicates that Congress envisioned suits reviewing "actions" by state commissions, as opposed to suits reviewing only the agreements themselves, and that Congress intended that such suits be brought exclusively in federal court.

In a similar vein, the PSCW and the PSCW Commissioners contend that we lack subject matter jurisdiction in case 99-2806 because that case involves the enforcement of previously approved interconnection agreements. According to the PSCW and the PSCW Commissioners, subsection 252(e)(6) does not confer jurisdiction on federal courts to review enforcement or other post-approval determinations made by state commissions. Instead, they submit, the plain language of subsection 252(e)(6) limits federal jurisdiction to reviewing a state commission's approval or rejection of an interconnection agreement or SGAT.

We decline to read subsection 252(e)(6) so narrowly. See Southwestern Bell Tel. Co. v. Public Util. Comm'n, 208 F.3d 475, 479-81 (5th Cir. 2000). A state commission's authority to approve or reject interconnection agreements under the Act necessarily includes the authority to interpret and enforce, to the same extent, the terms of those agreements once they have been approved by that commission. See id. at 479-80; Iowa Utils. Bd. v. F.C.C., 120 F.3d 753, 804 & n.24 (8th Cir. 1997) (stating that "the state commissions' plenary authority to accept or reject these [interconnection] agreements necessarily carries with it the authority to

enforce the provisions of agreements that the state commissions have approved"), aff'd in part and rev'd in part on other grounds sub nom. AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366 (1999)./6 In sum, we believe that subsection 252(e)(6) contemplates that state commissions will be parties to suits brought by those aggrieved by their determinations. This provision confers federal jurisdiction to review "state commission rulings on complaints pertaining to interconnection agreements and . . . such jurisdiction is not restricted to mere approval or rejection of such agreements." Southwestern Bell, 208 F.3d at 481; see also Illinois Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566, 570-71 (7th Cir. 1999) (stating that federal courts have jurisdiction under subsection 252(e)(6) to review "actions" by state commissions that relate to interconnection agreements).

B.  Abrogation

   Unquestionably, Congress could not have abrogated state sovereign immunity with the 1996 Telecommunications Act. The Act is an exercise of Congress' Commerce Power under Article I of the Constitution, see 47 U.S.C. sec. 151 (Supp. II 1996), and as the Supreme Court has made inescapably clear, Congress may not abrogate Eleventh Amendment immunity through the exercise of its Article I powers. See College Savings, 527 U.S. at 672; Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 527 U.S. 627, 636 (1999); Seminole Tribe v. Florida, 517 U.S. 44, 72 (1996) ("Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States."). Thus, because the states' immunity cannot be abrogated by the 1996 Telecommunications Act, we must look to whether Illinois and Wisconsin have waived their Eleventh Amendment immunity in the cases before us.

C.  Waiver

   1.

   The decision to waive Eleventh Amendment immunity lies solely with the state, see College Savings, 527 U.S. at 675, and we "indulge every reasonable presumption against" a state's waiver of its immunity, see id. at 682 (quotation marks and citation omitted). Thus, the test "for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." Id. at 675 (quoting Atascadero, 473 U.S. at 241 (internal quotation marks

omitted)). We may find that a state has waived its immunity when "the State voluntarily invokes" federal jurisdiction or when "the State makes a 'clear declaration' that it intends to submit itself" to federal jurisdiction. College Savings, 527 U.S. at 675-76 (citations omitted). In either case, there must be an "unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." Atascadero, 473 U.S. at 238 n.1; see also College Savings, 527 U.S. at 680 ("The whole point of requiring a 'clear declaration' by the State of its waiver is to be certain that the State in fact consents to suit."); Mueller v. Thompson, 133 F.3d 1063, 1064 (7th Cir. 1998) ("No magic words are required, but implicit waivers won't do; the court must be highly confident that the state really did intend to allow itself to be sued in federal court." (citations omitted)).

2.

The Supreme Court's recent decisions in Alden, College Savings and Florida Prepaid have refined the jurisprudence with respect to state sovereign immunity. The Court's decisions in Alden and Florida Prepaid, although impacting Eleventh Amendment jurisprudence in other important ways, do not bear directly on the questions of waiver that we confront in our cases. In contrast, the Court's decision in College Savings is especially pertinent to our analysis here because that decision squarely addressed Congress' power to obtain waivers of state immunity when Congress acts within its Article I powers. In College Savings, the Court held that states do not "constructively" waive their sovereign immunity by engaging in activities in interstate commerce that are regulated by Congress under its Article I power. See College Savings, 527 U.S. at 680. By so holding, the Court overruled Parden v. Terminal Railway of the Alabama Docks Department, 377 U.S. 184 (1964), a case in which the Court had held that Alabama waived its sovereign immunity by operating a railroad that was regulated by Congress under its Commerce Power.

At issue in College Savings was whether the state of Florida had "constructively" waived its immunity by marketing a college savings plan in interstate commerce. By an amendment to the Lanham Act,/7 Congress had subjected states to suit in federal court for false representations in commerce, and the plaintiff, College Savings Bank, argued that Florida had waived its immunity by engaging in the activity regulated by that federal statute. The Supreme Court disagreed. According to the Court, Florida could not waive its immunity merely by engaging in the regulated activity because "there is little reason to

assume actual consent based upon the State's mere presence in a field subject to congressional regulation." College Savings, 527 U.S. at 680; see also Burnette v. Carothers, 192 F.3d 52, 60 (2d Cir. 1999) (holding, in a post-College Savings case, that a state did not consent to suit for CERCLA violations by operating a prison that had released toxic chemicals).

The commissions in our cases argue that the Court's decision in College Savings has eliminated all so-called "constructive" or "implied" waivers. We, however, cannot agree with their assessment of that case. The Court in College Savings limited its abandonment of "constructive" or "implied" waivers to the "ill conceived" "constructive-waiver experiment of Parden." College Savings, 527 U.S. at 680. Indeed, the Court did not call into question other types of "constructive" waivers obtained by Congress acting within its Article I powers. Rather, the Court simply held that states cannot "constructively" waive their immunity by being forced by Congress to choose between preserving their sovereign immunity and engaging in an "otherwise lawful activity." Id. at 687.

To illustrate the types of "constructive" waivers that Congress may still obtain from states, the Court provided two examples of constructive waivers that are "fundamentally different" from Parden-style waivers and that are viable after College Savings. Id. at 686. In the first example, Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275 (1959), Congress required Tennessee and Missouri to waive their immunity as a condition for Congress' approval of the interstate compact made between the two states. The Court in College Savings explained that the constructive waiver exacted by Congress in that case was valid because, under the Compact Clause of the Constitution, states cannot form interstate compacts without congressional approval. As the Court explained it, Congress' consent to an interstate compact is a "gratuity" that Congress could give or withhold. College Savings, 527 U.S. at 686.

In the second example, South Dakota v. Dole, 483 U.S. 203 (1987), the Court held that Congress could impose conditions on a state's acceptance of federal funds allocated under the Spending Power. In Dole, Congress had conditioned the allocation of federal highway funds on South Dakota's raising its drinking age. The Court in College Savings explained that its holding in Dole made clear that "Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require

them to take, and that acceptance of the funds entails an agreement to the actions." College Savings, 527 U.S. at 686. Just as it was a "gratuity" for Congress to approve an interstate compact, the Court in College Savings noted that federal funds were a "gift" from Congress that it was under no obligation to give. Id. at 686-87.

Because the Court in College Savings endorsed some kinds of "constructive" waivers, we cannot accept the commissions' argument that all constructive waivers are now foreclosed. We instead understand the Court's holding in College Savings to set boundaries for congressional attempts to obtain waivers from states. See id. at 690 (stating that "[o]ur opinion today has sought to discern what the bounds [of federal power] are"). In Seminole Tribe, the Court had held that Congress could not abrogate state sovereign immunity through the exercise of its Article I powers. Parden-style waivers--in which a state was deemed to have waived its immunity simply by engaging in an activity regulated by Congress in the exercise of its Article I powers--nevertheless effectively allowed Congress to circumvent the holding of Seminole Tribe. See id. at 683. As the Court explained in College Savings, the type of "forced waiver" exacted by Congress under Parden, whereby the state is threatened with the sanction of waiving its immunity if it engages in a regulated enterprise, was really an abrogation of the state's immunity prohibited by Seminole Tribe. See id. (noting that forced waiver and abrogation are "the same side of the same coin"); see also Chavez v. Arte Publico Press, 204 F.3d 601, 604 n.5 (5th Cir. 2000) ("College Savings expressly overruled Parden and its implied waiver theory. That theory is no longer available to support an Article I abrogation of Eleventh Amendment Immunity." (emphasis added) (citation omitted)). The Court's decision in College Savings closed the "forced waiver" loophole left open by Parden.

With these principles in mind, we shall now turn to the cases before us to examine whether there is a valid waiver.

3.

We first examine, as a threshold matter, whether Congress, in inviting the states to waive their Eleventh Amendment immunity, has done so with sufficient clarity. When it intends to obtain a waiver of immunity from the states, Congress must "speak with a clear voice" so that the states may exercise their choice to waive their immunity "knowingly, cognizant of the consequences of their participation." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)

("Pennhurst I"); accord Atascadero, 473 U.S. at 238-40 (stating that the Court has required "an unequivocal expression of congressional intent" to obtain an Eleventh Amendment waiver from states (citation omitted)); see also Dole, 483 U.S. at 207 (quoting Pennhurst I and stating that Congress must state the condition "'unambiguously'").

The commissions submit that there can be no waiver of sovereign immunity in these cases because the language of the 1996 Telecommunications Act contains no clear and unambiguous expression of Congress' intent to condition the states' participation in the Act's regulatory scheme on their consent to suit in federal court. The commissions point out that the Act does not even mention sovereign immunity or indicate an intent to give states a choice between carrying out their responsibilities under the Act or retaining their sovereign immunity by letting the FCC fulfill their responsibilities. The absence of these elements from the statutory language negates, in the commissions' view, any possibility of a valid waiver; the statutory language contains no explicit manifestation that Congress clearly intended to condition the states' participation under the Act on their waiver of sovereign immunity.

We cannot accept this argument. Although the language of the statute does not contain the express waiver language that the commissions seek, the structure of the pertinent section of the statute, notably 47 U.S.C. sec. 252 (Supp. II 1996), nevertheless makes clear that Congress intended to provide for federal court review of any regulatory determination made under the section, whether by a state commission or, if the state commission chooses not to act, by the FCC acting in its place. Section 252 first describes the duties of the carriers seeking to enter into an interconnection agreement and then details the role of the state commissions in the mediation, arbitration and review process. It sets forth the standards by which the state commissions may impose terms upon the parties to the interconnection agreements during arbitration as well as the standards by which the state commissions must approve or reject an agreement. Subsection 252(e)(5) then provides that, if a state commission does not carry out its responsibilities under sec. 252, the FCC will act in place of the state commission. Subsection 252(e)(6), titled "Review of State commission actions," then provides that the exclusive remedy for a state commission's failure to act will be the proceedings before the FCC and any judicial review of the FCC's actions. It further provides that any party aggrieved by a state commission's

determination under sec. 252 may obtain review "in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 [and section 252]." 47 U.S.C. sec. 252(e)(6) (Supp. II 1996).

Thus, under the terms of sec. 252, the state commission or, if that body chooses not to act, the FCC will exercise regulatory authority over interconnection agreements. That administrative action, whether taken by a state administrative tribunal or by the FCC, is subject to review in federal court. If the reviewing body is a state commission, the statute provides that the commission's actions are reviewable in federal court under subsection 252(e)(6); if the reviewing body is the FCC, its actions are reviewable in federal court under 28 U.S.C. sec. 2342(1). In short, Congress has expressed unmistakably that, under the 1996 Telecommunications Act, states could participate in the federal regulatory function delegated to them by the federal government on the condition that their participation be reviewable in federal court. We therefore conclude that the 1996 Telecommunications Act satisfies the requirement that Congress clearly state that participation by the state in the regulatory scheme entails a waiver of immunity from suit in federal court. Accord MCI Telecomms. Corp. v. Public Serv. Comm'n, No. 99-4203, 2000 WL 783382, at *8 (10th Cir. June 20, 2000) (concluding that sec. 252 puts states on notice that Congress intends to subject them to suit in federal court if they act under sec. 252).

4.

We now turn to the question of whether the states have unequivocally waived their Eleventh Amendment immunity. As the Supreme Court has noted, there is "a fundamental difference" between "Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived [its] immunity" and "a State's expressing unequivocally that it waives its immunity." College Savings, 527 U.S. at 680-81. Therefore, we must determine whether the states made a clear declaration that they desired to waive their immunity.

The carriers do not contend that Illinois or Wisconsin waived their immunity by statute. Rather, they maintain that these states have waived their Eleventh Amendment immunity by accepting the federal government's invitation to act as regulators of the local telephone market in accordance with sec. 252 of the 1996 Telecommunications Act. We agree with that

assessment and therefore hold, as the Tenth Circuit held in MCI Telecommunications Corp. v. Public Service Commission, No. 99-4203, 2000 WL 783382, (10th Cir. June 20, 2000), that states voluntarily waive their sovereign immunity by accepting that invitation.

The commissions endeavor to distinguish the Petty- and Dole-style waivers endorsed by the Supreme Court in College Savings from the situations in the cases before us. According to the commissions, the waivers obtained by the 1996 Telecommunications Act are fundamentally different than those in Petty and Dole. They point out that Petty involved Congress' Compact Power and Dole its Spending Power, while the 1996 Telecommunications Act is an exercise of Congress' Commerce Power. We do not believe that this distinction is helpful to the analysis required by College Savings. In College Savings, the Supreme Court's analysis did not hinge on whether Congress was acting within its Commerce or Spending or Compact Powers, all of which are Article I powers. Rather, the validity of a purported waiver turns on whether the waiver is conditioned on the state's truly voluntary acceptance of a federal "gratuity." Accord Public Serv. Comm'n, 2000 WL 783382, at *7 ("[F]or a constructive waiver of sovereign immunity to be valid under College Savings Bank, it must be altogether voluntary and not forced from a state by Congress."). The significant commonality between Dole and Petty is not that each involved a power other than the Commerce Power; the key in those cases was that Congress had the prerogative to bestow a gratuity and that, by accepting the gratuity, the states agreed to undertake certain actions that Congress could not otherwise have required them to take.

It is clear that Congress, in exercising its Commerce Power, could determine that all regulation of the telecommunications industry ought to be entrusted to the federal government. See F.E.R.C. v. Mississippi, 456 U.S. 742, 764 (1982) ("[T]he commerce power permits Congress to pre-empt the States entirely in the regulation of private utilities."); Public Serv. Comm'n, 2000 WL 783382, at *8. And with the 1996 Telecommunications Act, we believe it equally clear that Congress did take over some aspects of the telecommunications industry. See AT&T Corp., 525 U.S. at 378-79 n.6 (stating that, as to those aspects addressed by the 1996 Telecommunications Act, Congress has "unquestionably" taken the regulation of local telecommunications competition away from the states); Public Serv. Comm'n, 2000 WL 783382, at *8. Although Congress cannot abrogate state sovereign immunity by exercising its Article I powers, see Seminole

Tribe, 517 U.S. at 72-73, and cannot "commandeer" state regulatory agencies with legislation forcing them to regulate on behalf of Congress, see Printz v. United States, 521 U.S. 898, 935 (1997); New York v. United States, 505 U.S. 144, 168 (1992), these limitations on congressional power do not prohibit Congress from obtaining a state's voluntary consent to federal jurisdiction. With the 1996 Telecommunications Act, Congress has created a complex federal regulatory scheme for many aspects of the telecommunications industry. One component of that scheme is the invitation from Congress to the states to participate in the federal regulation of interconnection agreements and other aspects of the local telephone market. Congress certainly had the power to take up the regulation of these areas on its own, and it certainly can invite the states to act on its behalf in carrying out those regulatory functions.

After the 1996 Telecommunications Act, the regulation of interconnection agreements and the approval of SGATs are no longer, in the terms employed by the Supreme Court in College Savings, "otherwise permissible activit[ies]" for the states. 527 U.S. at 687; cf. Public Serv. Comm'n, 2000 WL 783382, at *8 ("[W]ith the passage of the 1996 Act, Congress essentially transformed the regulation of local phone service from an otherwise permissible state activity into a federal gratuity."). Congress, exercising its authority to regulate commerce has precluded all other regulation except on its terms. Unlike the situation in Parden and in College Savings, the states are not merely acting in an area regulated by Congress; they are now voluntarily regulating on behalf of Congress./8 Unlike the situation in Parden, in which Alabama exercised its sovereign authority to operate a railroad, the state commissions have conducted arbitrations for interconnection agreements, have approved and enforced those agreements, and have acted on an SGAT under a federal grant of power. Their authority to act was derived from provisions of the Act and not from their own sovereign authority.

The commissions submit that the waivers in our cases cannot be likened to the kind of waiver obtained by Congress in the exercise of its Spending Power. This is so, the commissions tell us, because with Spending Clause waivers the states effectively enter into a "contract" with Congress--in exchange for the federal funding, the state agrees to the terms offered by Congress. We think that the commissions' analogy, however, tends to support, rather than weaken, our conclusion. The state commissions have

entered into the same kind of exchange with Congress that takes place when Congress offers federal funds conditioned on a state's acceptance of the federal terms./9 The only difference between the classic example of a Spending Clause gratuity of federal funds and the waivers in our cases is that, with the 1996 Telecommunications Act, Congress has offered the states, not federal funds, but a role as what the carriers have called a "deputized" federal regulator. In exchange for this grant of regulatory power, Congress has required the states to agree to submit to federal jurisdiction to review their actions. In Dole, the gratuity was money; the condition was a higher drinking age. Here, the gratuity is federal regulatory power; the condition is waiver of the state's immunity. Having accepted the regulatory power offered by Congress, Illinois and Wisconsin now must accept the condition that was attached to that grant of power. Cf. Board of Educ. of Oak Park v. Kelly E., 207 F.3d 931, 935 (7th Cir. 2000) (noting that "[o]ne string attached to money under the IDEA is submitting to suit in federal court" and holding that "having accepted the money, [states] must litigate in federal court"), petition for cert. filed, 69 U.S.L.W. 3001 (U.S. June 16, 2000) (No. 99-2027)./10

   We believe that College Savings does not alter the principle that states may waive their immunity by accepting a benefit from Congress that has conditions attached to that acceptance./11 Congress could--and did--take over regulation of a part of the telecommunications industry in accordance with its Commerce Power. Such regulation is no longer an "otherwise permissible activity" for states. Congress may choose to "give back" to states some of the regulatory power Congress has taken away, and Congress may attach conditions to the return of that power. Cf. College Savings, 527 U.S. at 686-87 (explaining that, when Congress bestows a gift or gratuity, it may attach conditions to a state's acceptance of that gift or gratuity). States are free to accept or reject the terms Congress has offered the states if they want a continued role in regulating this segment of the local telephone service market./12

D.  Ex parte Young
1.

   As an independent basis for decision, we also believe that the Eleventh Amendment does not bar the carriers from pursuing injunctive relief against the individual members of the state commissions. Under the Ex parte Young doctrine, a private party may sue individual state officials in federal court to obtain prospective relief for

an ongoing violation of federal law. See Ex parte Young, 209 U.S. at 159-60; Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 294 (1997) (O'Connor, J., concurring); id. at 298-99 (Souter, J., dissenting) ("The plaintiff must allege that the officers are acting in violation of federal law, and must seek prospective relief to address an ongoing violation, not compensation or other retrospective relief for violations past." (internal citation and footnote omitted)); Marie O., 131 F.3d at 615. Under this doctrine, federal courts are enabled to "vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" Pennhurst II, 465 U.S. at 105 (quoting Ex parte Young, 209 U.S. at 160)./13 The Supreme Court's decisions in Alden, College Savings and Florida Prepaid have not called the Ex parte Young doctrine into question. Indeed, the Court in Alden reaffirmed the doctrine's role in the sovereign immunity context. See Alden v. Maine, 527 U.S. 706, 748 (1999) (calling the Ex parte Young doctrine an "essential" part of the Court's sovereign immunity jurisprudence).

We agree with the Sixth and Tenth Circuits that these suits are "straightforward" Ex parte Young cases. Public Serv. Comm'n, 2000 WL 783382, at *9 (holding that state commissioners may be sued under the Ex parte Young doctrine for their approval and enforcement of a sec. 252 interconnection agreement); Michigan Bell Tel. Co., 202 F.3d at 867 (same). The carriers seek injunctive relief from what they allege to be determinations made by the commissioners that are contrary to the 1996 Telecommunications Act. The commissioners argue that, if any violations occurred, they occurred in the past, and that therefore the Ex parte Young doctrine should not apply. We cannot accept this argument. The challenged determinations are still in place, and the carriers seek to have the commissioners conform their future actions, including their continuing enforcement of the challenged determinations, with federal law. See Entergy, Arkansas, Inc. v. Nebraska, 210 F.3d 887, 898 (8th Cir. 2000) ("While the relief granted under Ex parte Young may only be prospective, proof for the claim necessitating relief can be based on historical facts, and most often will be."). Such relief is precisely the type contemplated by the Ex parte Young doctrine. Thus, the carriers' suits fit squarely within the traditional framework of Ex parte Young.
2.

The commissioners submit that the Supreme Court's decision in Seminole Tribe renders the Ex parte Young doctrine inapplicable to the cases before us. In Seminole Tribe, the Supreme Court

admonished that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon Ex parte Young." Seminole Tribe, 517 U.S. at 74. According to the commissioners, Congress has created in sec. 252 a "detailed remedial scheme" that is on par with the remedial scheme at issue in Seminole Tribe. Consequently, the commissioners argue, an Ex parte Young suit against them would run afoul of the Court's decision in Seminole Tribe.

We cannot accept the commissioners' characterization of the available remedies under the 1996 Telecommunications Act and, consequently, find their analogy to the situation in Seminole Tribe to be flawed. Section 252 of the Act does not create a "detailed remedial scheme" that manifests Congress' intent to limit the scope of statutory remedies available to parties aggrieved by the commissioners' interconnection determinations. The enforcement provision implicated in our cases merely states: "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 [and section 252]." 47 U.S.C. sec. 252(e)(6) (Supp. II 1996). The power of the court under subsection 252(e)(6) stands in stark contrast with the court's powers to impose what the Supreme Court called a "modest set of sanctions" under the statute at issue in Seminole Tribe. Seminole Tribe, 517 U.S. at 75.

In Seminole Tribe, the Court addressed the judicial enforcement scheme created by the Indian Gaming Regulatory Act ("the IGRA"). Congress had passed the IGRA in 1988 in order to provide a statutory framework for the operation and regulation of tribal gaming operations. Under the IGRA, Indian tribes could enter into the most heavily regulated class of gaming (i.e., slot machines, casino games, banking card games, dog racing, and lotteries) only after certain conditions had been met. One of those conditions imposed by the IGRA was that the tribe's operations had to conform to a valid compact between the tribe and the state in which the gaming operations were located. See 25 U.S.C. sec. 2710(d)(1).

The IGRA set forth the process by which tribes and states were to enter into these compacts. First, a tribe was required to request that the state enter into compact negotiations. Once a

request had been made, the state was obligated under the IGRA to "negotiate with the Indian tribe in good faith" to enter into a compact. Id. sec. 2710(d)(3)(A). Still other provisions of the IGRA made the state's obligation to negotiate in good faith judicially enforceable. See id. sec. 2710(d)(7)(A)(i) and (B)(i). Other provisions set forth what the Supreme Court described as "an elaborate remedial scheme" designed to ensure that a Tribal-State compact would be formed. See id. sec. 2710(d)(7)(B)(ii)-(vii)./14 Under this scheme, if the district court determined that the state had failed to negotiate in good faith, the IGRA only allowed the court to issue an order mandating that the tribe and the state enter into a compact within 60 days. See Seminole Tribe, 517 U.S. at 74. If the parties disregarded this order, the only recourse available to the district court was to order each party to submit a proposed compact to a mediator, who would then choose one. See id. at 74. And if the state refused to accept the compact chosen by the mediator, the IGRA provided that the mediator was to inform the U.S. Secretary of the Interior, who would then issue regulations to govern the tribe's gaming operations. See id. at 74-75.

Unlike the IGRA, in which "Congress chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under Ex parte Young," Seminole Tribe, 517 U.S. at 75-76, Congress has not limited the court's remedial power under subsection 252(e)(6) of the 1996 Telecommunications Act. We reach this conclusion guided by our decision in Marie O. v. Edgar, 131 F.3d 610 (7th Cir. 1997). In Marie O., a case decided in the wake of Seminole Tribe, we held that the Individuals with Disabilities Education Act ("the IDEA") did not contain an "explicit remedial scheme" that would prevent an Ex parte Young suit. Marie O., 131 F.3d at 616. The IDEA section involved in that case empowered a district court to grant "'such relief as it determines is appropriate'" to ensure compliance with certain provisions of the IDEA. Id. (quoting 20 U.S.C. sec. 1480(1)). Importantly, we noted that the remedial measures available under the IDEA did not expressly limit the role of the district court in redressing complaints with regard to the IDEA. Similarly, subsection 252(e)(6) does not limit the role or the power of the district court. Quite the contrary, subsection 252(e)(6) is silent as to how a district court would enforce its ruling under that section. Thus, we hold that Seminole Tribe does not preclude an Ex parte Young suit against the state commissioners here.

3.

Nor can we accept the contention that the Supreme Court's decision in Coeur d'Alene Tribe bars Ex parte Young suits by the carriers against the commissioners. The commissioners maintain that Ex parte Young suits against them would trammel "special sovereignty interests" of their states and, thus, should be precluded by Coeur d'Alene Tribe.

In Coeur d'Alene Tribe, a majority of the Court held that a federal court cannot grant prospective equitable relief under the Ex parte Young doctrine when that relief would implicate "special sovereignty interests" of the state and would be the "functional equivalent" to a form of legal relief otherwise barred by the Eleventh Amendment. Coeur d'Alene Tribe, 521 U.S. at 281–82. More precisely, the Court held that the Ex parte Young doctrine was inapplicable to the "particular and special circumstances" present in that case. Id. at 287. A majority of the Court held that the lawsuit against Idaho could not proceed under the Ex parte Young doctrine because the suit, in which the Coeur d'Alene Tribe sought to have the federal court divest the state of its ownership of land under Lake Coeur d'Alene, in essence would affect "Idaho's sovereign interest in its lands and waters" to a degree "fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." Id. at 287; see also id. at 296 (O'Connor, J., concurring) (agreeing that the Ex parte Young doctrine should not be extended to reach the Tribe's claim "to quiet title to sovereign lands" because such a lawsuit is really a suit against the state). The Court explained that the Tribe's lawsuit could not proceed under the Ex parte Young doctrine because the suit was the "functional equivalent of a quiet title action which implicates special sovereignty interests." Id. at 281.

Illinois' and Wisconsin's interests in the regulation of telecommunications providers in their respective states cannot be equated with Idaho's interest in its land, which the Court in Coeur d'Alene Tribe found so fundamental. In the wake of the 1996 Telecommunications Act, any "sovereign" interest Illinois and Wisconsin may have in regulating interconnection agreements and SGATs is derived solely from the regulatory role Congress has bestowed upon the states. Thus, the suits against the state commissioners to require compliance with the 1996 Telecommunications Act do not strike at core functions or fundamental powers of either Illinois or Wisconsin./15 Therefore, the availability of an Ex parte Young suit in our cases is not affected by the special limitation recognized by a majority of the Court in Coeur d'Alene Tribe. Accord Public Serv.

Comm'n, 2000 WL 783382, at *9 n.8.


Conclusion

   We hold that, by deciding to exercise the power
delegated to them by the Act, the states agreed
to the conditions attached to that grant of power
and thereby waived their Eleventh Amendment
immunity from suit in federal court. The federal
regulatory scheme set forth in sec.sec. 251 and
252 of the Act bestowed upon states a "gratuity."
Acceptance of that federal invitation to share in
the regulation of the telecommunications industry
is conditioned on a waiver of Eleventh Amendment
immunity. A state's decision to exercise that
regulatory authority--which would otherwise lie
with the federal government--necessarily
constitutes a waiver of its immunity from suit in
federal court.

   We also hold that, under Ex parte Young, the
Eleventh Amendment does not bar the carriers'
lawsuits against the individual commissioners.
Because the carriers have alleged ongoing
violations of federal law and because they seek
prospective equitable relief, their lawsuits fit
squarely within the traditional framework of Ex
parte Young. Moreover, the more recent
limitations on Ex parte Young suits that the
Supreme Court announced in Seminole Tribe and
Coeur d'Alene Tribe are not applicable here. The
1996 Telecommunications Act does not contain a
specific remedial scheme, and these lawsuits do
not implicate special sovereignty interests.

   Accordingly, we affirm the judgment of the
district court in 98-2127. We reverse the
judgment of the district court in 99-2805, 99-
2806, 99-2811, 99-2873, and 99-2992, and we
remand these cases to the district court for
further proceedings consistent with this opinion.

98-2127 AFFIRMED;
99-2805, 99-2806, 99-2811,
99-2873 & 99-2992 REVERSED and REMANDED




/1 Again, both MCI Telecommunications Corp. and MCI
Metro Access Transmission Services, Inc.

/2 A "Bell operating company" is one of the local
"Baby Bells" split off from AT&T in the
divestiture decree. See Peter W. Huber et al.,
Federal Telecommunications Law 1362 (2d ed.
1999); see also 47 U.S.C. sec. 153(4) (Supp. II
1996) (listing the individual Bell operating
companies).

/3 Ameritech Illinois also filed a separate action against the ICC Commissioners, challenging their approval of two negotiated interconnection agreements between Ameritech Illinois and other telecommunications carriers. An appeal in that case, 98-2256, originally was part of this appeal. The agreements at issue in 98-2256 were made through private negotiations without mediation or arbitration by the ICC. During the pendency of the appeal in 98-2256, however, Ameritech Illinois filed a motion requesting that we remand 98-2256 to the district court so that it may be dismissed voluntarily with prejudice. We have granted that motion and therefore need not address the applicability of the Eleventh Amendment to litigation involving such privately negotiated agreements.

We also have remanded to the district court a different case, 98-2566, which was originally part of this consolidated appeal, so that it too may be dismissed voluntarily.

/4 Three new entrants sought to intervene in Ameritech Wisconsin's suit over the SGAT, but the district court denied the motions because it concluded that the PSCW would adequately represent the prospective intervenors' interests. The district court's denial of the motions to intervene is not before us on appeal.

/5 In its second decision, the district court also held that, in light of this circuit's decision in Illinois Bell Telephone Co. v. Worldcom Technologies, Inc., 179 F.3d 566 (7th Cir. 1999), the PSCW and the PSCW Commissioners were necessary parties to these suits. Because the PSCW and the PSCW Commissioners were necessary parties and because the district court had concluded that they were entitled to immunity, the district court held that the cases had to be dismissed in their entirety for failure to join necessary parties. We hold today, however, that the PSCW and the PSCW Commissioners may be sued in federal court; thus, we need not address the Rule 19(b) arguments raised by the parties.

/6 See also Puerto Rico Tel. Co. v. Telecommunications Regulatory Bd., 189 F.3d 1, 10 (1st Cir. 1999) (assuming, without deciding, that state commission interpretations and enforcements of agreements are subject to federal court review under subsection 252(e)(6)).

/7 See 15 U.S.C. sec.sec. 1122, 1125(a) (as amended by the Trademark Remedy Clarification Act, Pub. L. No. 102-542, sec. 3(b)-(c), 106 Stat. 3567, 3567-68 (1992)).

/8 See also Public Serv. Comm'n, 2000 WL 783382, at *8 ("47 U.S.C.A. sec. 252 invites states to participate in the federal government's regulation of local telephone service."); Peter W. Huber et al., Federal Telecommunications Law sec. 3.3.4, at 227 (2d ed. 1999) ("As a backdrop to its primary reliance on privately negotiated agreements, however, Congress enlisted the aid of state public utility commissions to ensure that local competition was implemented fairly and with due regard to the local conditions and the particular historical circumstances of local regulation under the prior regime.").

/9 Cf. Litman v. George Mason Univ., 186 F.3d 544, 555 (4th Cir. 1999) (holding that a public university had waived its immunity by accepting Title IX funding and thus agreeing to the condition of waiver Congress had attached to those funds), cert. denied, 120 S. Ct. 1220 (2000); In re Innes, 184 F.3d 1275, 1284 (10th Cir. 1999) (holding that a state had waived voluntarily its immunity by agreeing to participate in the federal Perkins Loan Program, a federal program in which states are required to undertake certain actions in federal bankruptcy court proceedings), cert. denied, 120 S. Ct. 1530 (2000).

/10 It has been suggested to us that the commissioners do not have the power to waive the immunity of their respective states; that only the state legislatures can waive their states' Eleventh Amendment immunity. We believe, however, that the waivers of immunity have come from the states themselves (and not the commissions). It is the states that have authorized the commissions to regulate the telecommunications industry, see Ill. Comp. Stat. 5/2-101; Wis. Stat. sec. 196.02, and, despite the clear warning from Congress in subsection 252(e)(6) of the 1996 Telecommunications Act, neither Illinois nor Wisconsin have taken any steps to forbid their respective commissions from exercising the authority granted to them by Congress. Indeed, the states have agreed unmistakably and affirmatively to waive their immunity. By accepting the grant of regulatory power offered by Congress, and by allowing the state commissions to exercise that power, Illinois and Wisconsin cannot contend now that they are not bound by the conditions attached to that grant of power.

/11 At one time, privately negotiated agreements were at issue in a case before us. But as we have explained, supra note 3, we have granted Ameritech Illinois' motion to remand 98-2256 to the district court for a voluntary dismissal with prejudice. We therefore need not decide--and

reserve for another day--whether a state commission might have no true choice but to involve itself in the review process of a privately negotiated interconnection agreement in order to avoid the consequence of having the agreement be "deemed approved" under 47 U.S.C. sec. 252(e)(4) (Supp. II 1996). Cf. College Savings, 527 U.S. at 687 (stating that, in some instances, the inducement offered by Congress might be so coercive that the voluntariness of the waiver is destroyed).

/12 We are not unmindful that our colleagues in the Sixth Circuit have expressed the view that, in light of the Supreme Court's decisions in College Savings and Florida Prepaid, "it is virtually certain that a state utility commission's decision to accept regulatory authority under the [1996 Telecommunications Act] cannot legitimately be construed as a valid waiver of sovereign immunity." GTE North, Inc. v. Strand, 209 F.3d 909, 922 n.6 (6th Cir. 2000); see also Michigan Bell Tel. Co. v. Climax Tel. Co., 202 F.3d 862, 867 & n.2 (6th Cir. 2000) (declining to find that the state had waived its immunity by regulating under the Act and instead relying on the Ex parte Young doctrine to allow suits against individual state commissioners), petition for cert. filed, 68 U.S.L.W. 3742 (U.S. May 15, 2000) (No. 99-1878). As we have already indicated, however, we believe that the Court of Appeals for the Tenth Circuit has expressed the correct view, and we agree with its analysis. See Public Serv. Comm'n, 2000 WL 783382, at *8.

/13 The Ex parte Young doctrine may not be used to enjoin violations of state law. See Pennhurst II, 465 U.S. at 106.

/14 To illustrate the elaborate nature of this remedial scheme, we shall set out the Supreme Court's full description of it:

Sections 2710(d)(7)(B)(ii)-(vii) describe an elaborate remedial scheme designed to ensure the formation of a Tribal-State compact. A tribe that brings an action under sec. 2710(d)(7)(A)(i) must show that no Tribal-State compact has been entered and that the State failed to respond in good faith to the tribe's request to negotiate; at that point, the burden then shifts to the State to prove that it did in fact negotiate in good faith. sec. 2710(d)(7)(B)(ii). If the district court concludes that the State has failed to negotiate in good faith toward the formation of a Tribal-State compact, then it "shall order the State and Indian Tribe to conclude such a compact within a 60-day period." sec. 2710(d)(7)(B)(iii). If no compact has been concluded 60 days after

the court's order, then "the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact." sec. 2710(d)(7) (B)(iv). The mediator chooses from between the two proposed compacts the one "which best comports with the terms of the Act and any other applicable Federal law and with the findings and order of the court," ibid., and submits it to the State and the Indian tribe, sec. 2710(d)(7)(B)(v). If the State consents to the proposed compact within 60 days of its submission by the mediator, then the proposed compact is "treated as a Tribal-State compact entered into under paragraph (3)." sec. 2710(d)(7)(B)(vi). If, however, the State does not consent within that 60-day period, then the Act provides that the mediator "shall notify the Secretary of the Interior" and that the Secretary "shall prescribe procedures under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction." sec. 2710(d) (7)(B)(vii).

Seminole Tribe, 517 U.S. at 50.

/15 Compare J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1287 (10th Cir. 1999) (holding that "[a] state's interest in administering a welfare program at least partially funded by the federal government is not such a core sovereign interest as to preclude the application of Ex parte Young"), and Branson Sch. Dist. RE-82 v. Romer, 161 F.3d 619, 632-33 (10th Cir. 1998) (holding that an action, which was "the functional equivalent of a breach of trust action" against the state for planned changes to its management of public lands, was within the scope of the Ex parte Young doctrine because the relief sought would not alter the nature of the state's ownership in the land but would affect only the manner in which the state managed the lands at issue), cert. denied, 119 S. Ct. 1461 (1999), with MacDonald v. Village of Northport, 164 F.3d 964, 972 (6th Cir. 1999) (holding that a state's "great interest in maintaining access to the Great Lakes" was a "special sovereignty interest" that precluded an Ex parte Young suit), and ANR Pipeline Co. v. Lafaver, 150 F.3d 1178, 1193 (10th Cir. 1998) (holding that a state's power to tax is akin to the "special sovereignty interests" identified in Coeur d'Alene Tribe), cert. denied, 525 U.S. 1122 (1999).